**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
mdb@kuzykclassactions.com
2121 Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311

**DENLEA & CARTON LLP**
Jeffrey I. Carton (pro hac vice forthcoming)
jcarton@denleacarton.com
Catherine H. Friesen (pro hac vice forthcoming)
cfriesen@denleacarton.com
John P. Kane (pro hac vice forthcoming)
jkane@denleacarton.com
2 Westchester Park Drive, Suite 410
White Plains, New York 10604
Tel.: (914) 331-0100
Fax: (914) 331-0105

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| **BRYAN LARSEN, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**WALMART INC.**<br><br>**Defendant.** | **CASE NO.:** 5:26-cv-5753<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiff Bryan Larsen ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against Defendant Walmart Inc. ("Walmart" or "Defendant"), and alleges the following based upon personal knowledge as to Plaintiff's own acts and experiences and, as to all other matters, upon information and belief, including the investigation conducted by Plaintiff's counsel.

2. This is a proposed class action on behalf of a class of California consumers seeking redress for Defendant's deceptive practices with respect to the advertising, labeling, marketing, and sale of its Equate-brand Maximum Strength and Nighttime Sleep-Aid products containing the active ingredient diphenhydramine hydrochloride ("diphenhydramine") (the "Products"), which Defendant uniformly and prominently label as "Non habit-forming."






3. Defendant manufactures, distributes, markets, labels, and sells these Products under the Equate brand. Each Product contains diphenhydramine as its sole active ingredient and prominently claims that the Products are non-habit forming.

4. Unfortunately, the claim that the Products are "non-habit forming" is false and misleading because the Products' active ingredient, diphenhydramine, along with its typical use, has been shown to be habit forming.

5. Defendant knows that consumers are willing to pay more for sleep-aid products labeled as "non-habit-forming" because they perceive such products to be safer and healthier alternatives to comparable sleep aids that carry a risk of habit formation.

6. Reasonable consumers such as Plaintiff do not have the specialized knowledge necessary to understand the chemical makeup of the active ingredient in the Products as being inconsistent with Defendant's advertised claim that they are

"non habit-forming." Reasonable consumers such as Plaintiffs understandably and necessarily rely on Defendant's label claims to be truthful and not misleading.

7. By misleadingly labeling the Products as "non habit-forming," Defendant has profited from consumers' preference for non-habit forming sleep aids.

8. Plaintiff alleges that Defendant's conduct constitutes a breach of warranty and violates California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq.; California's False Advertising Law, Bus. & Prof. Code §§ 17500, et seq.; and California's Consumers Legal Remedies Act, Civ. Code §§ 1750, et seq.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The proposed Class consists of thousands of members; the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and minimal diversity exists because Plaintiff is a citizen of California while Defendant Walmart Inc. is a citizen of Delaware and Arkansas. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

10. The amount in controversy exceeds $5,000,000 for Plaintiff and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiff and members of the putative Class, the profits reaped by Defendant from its transactions with Plaintiff and the Class as a direct and proximate result of the wrongful conduct alleged herein, and the injunctive and equitable relief sought.

11. This Court has personal jurisdiction over Defendant because Defendant conducts substantial business throughout California and within this District, including the marketing, distribution, and sale of the Products, and because a substantial part of the events giving rise to Plaintiff's claims occurred in California and within this District.

12. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and transactions giving rise to Plaintiff's claims occurred in this District. Specifically, Plaintiff purchased the Products in this District, and Defendant has marketed, advertised, distributed, and sold the Products within this District.

## PARTIES

13. Plaintiff Brayn Larsen is, and at all relevant times has been, an individual residing in Victorville, California.

14. Mr. Larsen routinely purchased Equate Maximum Strength Sleep-Aid Products over the past 3 years from Walmart locations at or near his residence including most recently in or about June 2026.

15. When Mr. Larsen purchased the Product, he saw and read the Product's front label claiming that the Product was "non habit-forming." It was a material representation on which Mr. Larsen relied in making his decision to purchase the Product.

16. Mr. Larsen believed the representations on the Product's label were accurate, and in particular that the Product was "Non habit-forming."

17. Plaintiff believed that Defendant lawfully marketed and sold the Product.

18. Plaintiff relied on Defendant's labeling and was misled thereby.

19. Plaintiff would not have purchased the Product, or would have purchased it on different terms, had he known the truth—namely, that the Product poses a risk of habitual use.

20. Plaintiff does not possess any specialized knowledge, skill, experience, or education in sleep-aid products, or in the ingredients used in the Products, and thus had no way of determining that the non-habit forming claim was false at the time of purchase.

21. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

22. If Plaintiff had reason to believe that Defendant's marketing and labeling of the Products were truthful, non-misleading, and lawful, he would purchase Defendant's Products in the future but is currently unable to rely on the truth of the Defendant's representations and therefore cannot confidently purchase the Products again.

23. Defendant Walmart Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart is one of the largest retailers in the world and manufactures, distributes, markets, labels, and sells the Equate-branded Products at issue in this action, including through its retail stores and website in California and throughout the United States.

## GENERAL ALLEGATIONS

### A. Consumer Demand For Sleep-Aid Products

24. Sleep is critical for good health. The Centers for Disease Control and Prevention ("CDC") recognizes that adults need at least seven hours of sleep per night and that insufficient sleep increases the risk of type 2 diabetes, cardiovascular disease, obesity, and depression among others.[1]

25. Unfortunately, a substantial portion of the U.S. population does not get enough sleep. According to the CDC, in 2024 approximately 30.5% of U.S. adults slept less than seven hours on average in a 24-hour period, 15.4% reported trouble falling asleep, and 18.1% reported trouble staying asleep, most days or every day.[2]

---

[1] Centers for Disease Control and Prevention, *1 in 3 Adults Don't Get Enough Sleep*, (Feb. 16, 2016), https://archive.cdc.gov/www_cdc_gov/media/releases/2016/p0215-enough-sleep.html. Last visited July 18, 2026.

[2] Centers for Disease Control and Prevention, National Center For Health Statistics, *Short Sleep Duration and Sleep Difficulties Among Adults: United States, 2024*, NCHS Data Brief No. 559, April 2026. Available at https://www.cdc.gov/nchs/products/databriefs/db559.htm. Last visited July 18, 2026.

26. Faced with these difficulties, many consumers have turned to sleep-aid products. In 2020, the CDC found that 8.4% of U.S. adults took medication to help them fall or stay asleep most days or every day.[3] By 2024, the numbers increased to 12.9%. Nearly half of these consumers used over the counter remedies.

27. As the use of over the counter sleep aids have grown, so too has consumer demand for the safest and healthiest sleep-aid products.

28. Many consumers accordingly seek out sleep aids that they reasonably believe will not create a habit or dependence – a market trend that has driven sales of Products claiming to be non-habit forming such as the Defendant's. Reflecting this demand, the global sleep-aid market was valued at $49 billion in 2025 and projected to reach upwards of $95 billion by 2033.[4]

**B. <u>Demand for Non Habit Forming Sleep Aids</u>**

29. In 2016 Consumer Reports found that 41% of OTC sleep-aid users took the product for a year or longer, and nearly one in five took it daily.[5] Due to the pervasive use of sleep-aids, consumers increasingly seek out products that are the

---

[3] Centers for Disease Control and Prevention, *Sleep Medication Use in Adults Aged 18 and Over: United States, 2020*, Centers for Disease Control and Prevention, NCHS Data Brief No. 462 (Jan. 2023). Available at https://www.cdc.gov/nchs/products/databriefs/db462.htm (last visited July 18, 2026); Centers for Disease Control and Prevention, National Center for Health Statistics, *Use of Sleep Aids Among Adults Age 18 and Older: United States, 2024*, Health E-Stat No. 116 (Apr. 2026). Available at https://www.cdc.gov/nchs/data/hestat/hestat116.htm (last visited July 18, 2026).

[4] Sleep Aids Market Size, Share & Growth Report, 2026–2033, Grand View Research, https://www.grandviewresearch.com/industry-analysis/sleep-aids-market-report (last visited July 19, 2026).

[5] G. Skinner, *Can You Get Hooked on Over-the-Counter Sleep Aids?*, Consumer Reports (Dec. 29, 2016), https://www.consumerreports.org/drugs/over-the-counter-sleep-aids-can-you-get-hooked/ (last visited July 18, 2026).

safest to use, often turning to natural remedies and sleep aids advertised as non-habit forming.[6]

30. To capitalize on consumers' demand for non-habit forming sleep aids, and in an effort to increase profits, Defendant prominently marketed their Products as "non-habit forming," deliberately leading reasonable consumers, including Plaintiff, to incorrectly believe that the Products do not and cannot cause habitual use.

31. The "non-habit forming" representation is prominently displayed on the principal display panel of every Product label and is clearly designed to capture consumers' attention. It is there to reassure the public that this accessible over-the-counter medication to combat sleeplessness will not come with the risks associated with dependence. Unfortunately, the Product's only active ingredient, diphenhydramine, is a sedating antihistamine which leads to dependence, and the chronic consumption of which can lead to a host of adverse neurologic consequences including psychosis.[7]

## C. Diphenhydramine Is Habit-Forming

32. The American Psychological Association defines a *habit* as a "well-learned behavior or automatic sequence of behaviors that is relatively situation specific and over time has become motorically reflexive and independent of motivational or cognitive influence," and *habit formation* as "the process by which,

---

[6] Eric Suni et al., Sleep Aids: Know the Types, Benefits, & Risks, Sleep Foundation (July 9, 2025), https://www.sleepfoundation.org/sleep-aids (last visited July 18, 2026).

[7] Jagroop S., *Chronic Diphenhydramine Abuse and Withdrawal: A Diagnostic Challenge*, 7 Neurol. Clin. Pract. 439 (Oct. 2017). Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5874453/ (last visited July 18, 2026); Kate Warren, *Acute Delirium Associated With Diphenhydramine Withdrawal in a Patient With Complex Medical Conditions*, 20 Am. J. Psychiatry Residents' J. 12 (June 4, 2025). Available at https://psychiatryonline.org/doi/10.1176/appi.ajp-rj.2025.200405 (last visited July 18, 2026); Mosca, A., et al., *Over-the-counter Psychosis: A Systematic Review of the Misuse of Antihistamines, Cough Medicines, and Decongestants and the Risk of Developing Psychosis* (2025). Available at https://pubmed.ncbi.nlm.nih.gov/39976040/ (last visited July 19, 2026).

through repetition or conditioning, … humans acquire a behavior that becomes regular and increasingly easy to perform."[8]

33. The same is confirmed by common usage (*e.g.*, Dictionary.com defines habit as "an acquired behavior pattern regularly followed until it has become almost involuntary", "customary practice or use," "a tendency or disposition to act in a particular way," "established custom, usual practice").[9]

34. A sleep aid, such as Defendant's Product, taken as part of a fixed bedtime routine is a paradigmatic example of a habit. Indeed, decades of behavioral research show that repeating a simple action (*e.g.*, taking a pill) in a stable context (*e.g.*, bedtime) produces automatic, cue-triggered behavior that persists even after conscious motivation fades.[10] "[P]eople rely on them to be able to sleep and then once they start taking them it's very difficult without it."[11]

35. Notably, a habit is not the same as addiction. "Habits . . . are like a lesser form of addiction: [t]he more you engage in the past, the more likely you are to

---

[8]APA Dictionary of Psychology, "Habit" and "Habit Formation," American Psychological Association, dictionary.apa.org. The World Health Organization's Expert Committee on Addiction-Producing Drugs likewise defines drug "habituation" as a condition marked by a desire (but not compulsion) to continue taking a drug for an improved sense of well-being, with some degree of psychic dependence but no physical dependence. WHO, Expert Committee on Addiction-Producing Drugs, Seventh Report, WHO Tech. Rep. Series No. 116 (1957).

[9] Habit, Dictionary.com, https://www.dictionary.com/browse/habit (last visited July 18, 2026).

[10]See, e.g., B. Gardner et al., Making health habitual: the psychology of 'habit-formation' and general practice, 62 Brit. J. Gen. Practice 664 (2012); P. Lally et al., How are habits formed: Modelling habit formation in the real world, 40 Eur. J. Soc. Psychol. 998 (2010). Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC3505409/ (last visited September 16, 2026)

[11] *Users of Non-Habit Forming OTC Sleep Aids Can Develop a Dependency*, ABC13 Eyewitness News (Feb. 7, 2017). Available at https://abc13.com/health/you-could-actually-be-hooked-on-your-otc-sleep-aid-/1740811/ (last visited July 18, 2026) (quoting Dr. Richard Castriotta, Medical Director, Sleep Disorders Center, Memorial Hermann-Texas Medical Center and UTHealth).

engage today."[12] Habitual behavior is characterized as "behavior that has become automatized, highly stimulus bound, inflexible, and insensitive to the associated outcomes (positive or negative)."[13]

36. Diphenhydramine is a decades-old antihistamine that was principally used as a remedy for seasonal allergies. It works by blocking the histamine receptors in the brain that control wakefulness. While "drowsiness" was an unwelcome side effect for seasonal allergy sufferers, it quickly became the cornerstone effect for those seeking to induce sleep. What was originally intended for consumers with an intermittent seasonal need, was now being marketed to consumers suffering from chronic sleep issues – a decision with significant consequences, namely that prolonged use of diphenhydramine was habit forming.

37. Peer-reviewed pharmacological and clinical studies show diphenhydramine engages the brain's dopaminergic reward circuitry, produces tolerance to its intended sedative effect, and causes documented dependence, withdrawal, and escalates misuse.

38. The sedative effects of diphenhydramine, combined with its ability to include feelings of relaxation and well-being, make it prone to habitual use even without physical addiction. Clinical research has shown that tolerance to the sedative effects of diphenhydramine can develop within three days, reducing its effectiveness with repeated use.[14]

---

[12] Carmen Nobel, *How to Get People Addicted to a Good Habit*, Forbes (Jan. 27, 2018). Available at https://www.forbes.com/sites/hbsworkingknowledge/2018/01/27/how-to-get-people-addicted-to-a-good-habit/ (last visited July 18, 2026).

[13] Zsuzsika S., et al., *The role of habits and motivation in human drug addiction: a reflection*, 5 Front Psychiatry 1, 1 (Jan. 29, 2014). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3905212/pdf/fpsyt-05-00008.pdf (last visited July 18, 2026).

[14] Richardson, G., et al., *Tolerance to Daytime Sedative Effects of H1 Antihistamines*, 22 J. Clin. Psychopharmacology 511, 511-15 (Oct. 2002). Available at https://pubmed.ncbi.nlm.nih.gov/12352276/ (last visited July 18, 2026).

39. The pharmacological properties of diphenhydramine commonly induce habitual misuse and dependence. The drug inhibits the reuptake of serotonin, a neurotransmitter affecting mood regulation, contributing to misuse as individuals seek the familiar pattern of its sedating and hallucinogenic effects.[15] Frequent use of diphenhydramine leads to developing a tolerance to the drug that makes it difficult to stop without facing withdrawal symptoms.[16]

40. Consumers are not expected to have the knowledge that the medication may become less effective or habit forming with prolonged use, and may reasonably believe that they can use a sleep aid, labeled “non-habit forming” daily, without risk of tolerance or dependence. The high potential for misuse stems from the development of a tolerance to diphenhydramine and an onslaught of withdrawal symptoms that worsen with prolonged use.

41. In 2008 researchers at the National Institute on Drug Abuse compared diphenhydramine to classes of drugs commonly abused by humans finding that diphenhydramine increased dopamine transmission in a pattern most similar to psychostimulants such as cocaine, providing a neurobiological basis for the habitual use and occasional misuse of over-the-counter antihistamine medications.[17]

---

[15] Antonia Nemanich, et al., *Increased rates of diphenhydramine overdose, abuse, and misuse in the United States, 2005–2016*, 59 Clinical Toxicology 1002 (Mar. 10, 2021). Available at https://www.tandfonline.com/doi/full/10.1080/15563650.2021.1892716 (last visited July 18, 2026); Tanda, G et al., *Cocaine-Like Neurochemical Effects of Antihistaminic Medications*, 106 J. Neurochem. 147 (2008). Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6741778/ (last visited July 18, 2026).

[16] Paula K. Schweitzer, et al., *Sleepiness and performance during three-day administration of cetirizine or diphenhydramine*, 94 J. Allergy Clinical Immunology 716, 722 (Oct. 1994), https://pubmed.ncbi.nlm.nih.gov/7930305/ (last visited July 18, 2026); S. Saran et al., *Chronic diphenhydramine abuse and withdrawal: A diagnostic challenge*, October 2017, Neurology Clinical Practice. Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5874453/ (last visited July 18, 2026).

[17] See G. Tanda *supra* fn. 15.

42. Another report from 2008 describes a case of diphenhydramine dependence and withdrawal finding that anticholinergic medications such as diphenhydramine "have the potential for dependence."[18] That case followed five previously reported cases, involving six patients, all of whom exhibited features of Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV) criteria for substance dependence. [19]

43. Beyond physical dependence, the scientific literature documents the behavioral hallmarks of habit formation, compulsive use, craving, escalation, and inability to stop -- often meeting formal diagnostic criteria for substance dependence. In 2017 researchers documented chronic diphenhydramine abuse producing a genuine withdrawal syndrome that resolved on re-administration (*i.e.,* a hallmark of physiologic dependence).[20]

44. In 2021, researchers conducted a systematic review of over the counter drug misuse identifying diphenhydramine as one of the two most-reported antihistamines of concern, with recreational use principally motivated by "relaxation, calmness, and sleep improvement."[21]

---

[18] Bonham, C., et al., *Severe Diphenhydramine Dependence and Withdrawal: Case Report*, 5 J. Dual Diagnosis 97 (2009). Available at https://doi.org/10.1080/15504260802620269 (last visited July 18, 2026).

[19] A. Thomas, D.G. Nallur, N. Jones & P.N. Deslandes, Diphenhydramine Abuse and Detoxification: A Brief Review and Case Report, 23 J. Psychopharmacology 101 (Jan. 2009), https://journals.sagepub.com/doi/10.1177/0269881107083809 (last visited July 18, 2026); see also Jagroop S. Saran et al., Chronic Diphenhydramine Abuse and Withdrawal: A Diagnostic Challenge, 7 Neurol. Clin. Pract. 439 (Oct. 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5874453/ (last visited July 18, 2026).

[20] Saran, J., et al., *Chronic Diphenhydramine Abuse and Withdrawal: A Diagnostic Challenge*, 7 Neurol. Clin. Pract. 439 (Oct. 2017). Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC5874453/ (last visited July 18, 2026).

[21] Schifano, F., et al., *Focus on Over-the-Counter Drugs' Misuse: A Systematic Review on Antihistamines, Cough Medicines, and Decongestants*, 12 Frontiers in Psychiatry 657397, at 9 (May 7, 2021). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8138162/ (last visited July 18, 2026).

45. Decades of psychological research demonstrate that repetition of a simple action (*e.g.,* taking a sleep aid), in a consistent context (*e.g.,* before going to bed) leads to that action being automatically triggered upon subsequent exposure to those cues, and that such a habit is likely to persist even after conscious attention or motivation has diminished. Defendant's Products are used in precisely this situation-specific context, making consumers susceptible to habitual use.

46. The same concern is echoed by the American Geriatrics Society which describes first-generation antihistamines, including oral diphenhydramine, as potentially inappropriate medications to *avoid* in adults 65 and older, citing strong anticholinergic effects, reduced clearance, and, notably, *tolerance when used as a hypnotic.*[22]

47. Given the known pharmacological profile of diphenhydramine and its intended use as a routine nighttime sleep aid (*i.e.,* taken repeatedly over consecutive nights) Defendant knew that consumers would use the Products in sustained patterns that increase the risk of dependence and/or abuse. Yet, the Products' front label offered a categorical reassurance that the Products are "non-habit forming," creating a misleading impression of the Products' effects which do not reflect the reality of its repeated use.

## D. The Reasonable Consumer

48. Reasonable consumers, including Plaintiff, interpret the phrase "not-habit forming" to mean that the Products do not and cannot cause habitual use. *i.e.,* that they do not pose a risk of frequent, routine use over prolonged periods. This

---

[22] American Geriatrics Society 2023 Updated AGS Beers Criteria for Potentially Inappropriate Medication Use in Older Adults, 71 J. Am. Geriatr. Soc'y 2052 (2023) (listing first-generation antihistamines, including oral diphenhydramine, among medications to avoid in adults 65 and older because, inter alia, "tolerance develops when used as hypnotic"). Available at https://pubmed.ncbi.nlm.nih.gov/37139824/ (last visited July 18, 2026).

interpretation is consistent with the ordinary dictionary meaning of “habit” and “habit-forming,” and the definition promulgated by the American Psychological Association.

49. Defendant’s claim that its Products are “Not-Habit Forming” was and is material to reasonable consumers, including Plaintiff, in deciding whether to purchase the Products. That the Products are “Non habit-forming” is an attribute that consumers value and that motivates their purchasing decisions, as reflected by Defendant’s decision to place the representation prominently on the front label.

50. Consumers, including Plaintiff, do not know, and have no reason to know, at the time of purchase that the Products’ claim to be “not-habit forming” is false. Reasonable consumers do not possess the specialized scientific knowledge and cannot discern from the Products’ ingredient disclosures that diphenhydramine is capable of causing habitual use.

51. Accordingly, Defendant knew, or should have known, that the “not-habit forming” claim was false, misleading, and deceptive at the time it manufactured, marketed, labeled, and sold the Products.

## NO ADEQUATE REMEDY AT LAW

52. Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

53. Broader Statutes of Limitations. The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations for damages claims under the CLRA.

54. Broader Scope of Conduct. The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. The UCL creates a cause of action for violations of other laws, which does not require, among other things, that a reasonable consumer would have been deceived in order to establish a violation. Thus, Plaintiff and Class members may be entitled to restitution

under the UCL, while not entitled to damages under other causes of action asserted herein (*e.g.*, the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

55. Defendant continues to misrepresent the Product claiming the Products are "non habit-forming" thereby necessitating injunctive relief in order to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm).

56. Finally, this is an initial pleading. The adequacy and availability of all remedies, including legal and equitable, will not be resolved until the case is further advanced upon the closure of discovery, resolution of class certification and any potential summary judgment.

## ECONOMIC INJURY

57. Plaintiff sought to buy Products that were lawfully labeled, marketed, and sold.

58. Plaintiff saw and relied on Defendant's misleading labeling of its Products.

59. Plaintiff believed that the purchased Products were "non habit-forming."

60. Plaintiff believed that the Products were lawfully marketed and sold.

61. In reliance on the claims made by Defendant regarding the qualities of its Products, Plaintiff paid a price premium.

62. As a result of his reliance on Defendant's misrepresentation, Plaintiff received Products that posed a risk of habitual use, contrary to what he reasonably believed.

63. Plaintiff received Products that were unlawfully marketed and sold.

64. Plaintiff lost money and thereby suffered injury because he would not have purchased the Products, and/or would not have paid as much for them, absent the misrepresentation.

65. Defendant knows that the claim the Products are "non habit-forming" is material to a consumer's purchasing decision.

66. Plaintiff altered his position to his detriment and suffered damages in an amount equal to the amounts he paid for the Products, and/or in additional amounts attributable to the deception.

67. By engaging in the false and deceptive conduct alleged herein, Defendant reaped, and continues to reap, financial benefits in the form of sales and profits from its Products.

68. Plaintiff would be willing to purchase the Products again in the future should he be able to rely on Defendant's marketing as truthful and non-deceptive.

## CLASS ACTION ALLEGATIONS

69. Plaintiff brings this action on behalf of himself and a class of all others similarly situated, defined as follows:

> **California Class**: All persons who, within four years prior to the filing of this Complaint, purchased the Products in California for personal, family, or household purposes and not for resale (the "Class").

70. The "Class Period" is the maximum time allowable as determined by the statute-of-limitations periods accompanying each cause of action.

71. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), 23(b)(3), and 23(c)(4).

72. Excluded from the Class are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors, and assigns; and (ii) the judges to whom this action is assigned and any member of their immediate families.

73. Plaintiff reserves the right to amend or otherwise alter the Class definition at the appropriate time in response to information learned through discovery, legal arguments advanced by Defendant, or otherwise.

74. Upon information and belief, there are thousands of members of the Class dispersed throughout California. Members of the Class are so numerous that individual joinder of all members would be impracticable.

75. There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action. Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting only individual Class members. These common questions include, but are not limited to:

a. Whether Defendant marketed, packaged, or sold the Products to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations;
b. Whether the Challenged Representation, “Non habit-forming,” is false or misleading to a reasonable consumer;
c. Whether Defendant omitted or misrepresented material facts in connection with the sale of the Products;
d. Whether Defendant participated in and pursued the common course of conduct complained of herein;
e. Whether Defendant has been unjustly enriched as a result of its unlawful business practices;
f. Whether Defendant’s actions violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.;

g. Whether Defendant's actions violate the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.;

h. Whether Defendant's actions violate the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.;

i. Whether Defendant breached express warranties made to Plaintiff and the Class;

j. Whether Defendant should be enjoined from continuing the practices described herein;

k. Whether Plaintiff and members of the Class are entitled to declaratory relief; and

l. Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the practices described herein.

76. Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like every other Class member, purchased Defendant's Products bearing the Challenged Representation. Plaintiff is no different in any relevant respect from any other Class member, and the relief sought is common to the Class.

77. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, and he has retained counsel competent and experienced in conducting complex class-action litigation. Plaintiff and his counsel will fairly and adequately protect the interests of the Class.

78. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member are relatively small given the modest cost of the Products, making it impracticable for Class members to seek redress individually. Individualized litigation would also present the potential for inconsistent or contradictory judgments and would increase the delay and expense to all parties and the court. By contrast, a class action

presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

79. The requirements for maintaining a class action under Rule 23(b)(2) are also met because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CASUES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Express Warranty
### (Cal. Com. Code § 2313)

80. Plaintiff incorporates each and every allegation contained in the paragraphs above as if fully restated herein.

81. Defendant made express warranties to Plaintiff and members of the Class that the Products were "Non habit-forming."

82. Plaintiff's express warranty claims are based on violations of Cal. Com. Code §§ 2313 and 2607.

83. The express warranties made to Plaintiff and members of the Class appear on every Product label. This warranty regarding the nature and quality of the Products relates to the goods being purchased and became part of the basis of the bargain.

84. Plaintiff and the Class purchased the Products in the belief that they conformed to the express warranties made on the Products' labels.

85. Defendant breached the express warranties by failing to supply goods that conformed to the warranties it made—namely, the Products pose a risk of habitual use and are therefore not "non habit-forming." As a result, Plaintiff and members of the Class suffered injury and are entitled to be compensated for the damages they suffered.

86. Plaintiff and the members of the Class paid money for the Products but did not obtain the full value of the advertised Products. Had they known the truth, they would not have purchased the Products or would have paid less for them. Accordingly, Plaintiff and the Class have suffered injury in fact and lost money or property as a result of Defendant's conduct, and are entitled to recover damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## SECOND CAUSE OF ACTION
### "Unlawful" Business Practices in Violation of the Unfair Competition Law (Bus. & Prof. Code §§ 17200, et seq.)

87. Plaintiff incorporates each and every allegation contained in the paragraphs above as if fully restated herein.

88. The UCL defines unfair competition to include any "unlawful, unfair or fraudulent" business act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

89. A business act or practice is "unlawful" under the UCL if it violates any other established state or federal law.

90. Defendant's acts, omissions, misrepresentations, and practices concerning the Products alleged herein constitute "unlawful" business acts and practices in that they violate, among other laws, the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, et seq., and its implementing regulations, including at least the following:

a. 21 U.S.C. § 352(a), which deems a drug misbranded if its labeling is false or misleading in any particular;
b. 21 U.S.C. § 331(a), (g), and (k), which prohibit the introduction into interstate commerce, and the misbranding, of a misbranded drug; and
c. the requirement that over-the-counter drug labeling be

truthful and non-misleading, which the "non-habit forming" representation -- a voluntary marketing claim not required or authorized by any applicable over-the-counter drug monograph -- violates.

91. California's Sherman Food, Drug, and Cosmetic Law (the "Sherman Law"), Cal. Health & Safety Code § 109875 et seq., independently prohibits the misbranding of drugs. Cal. Health & Safety Code § 111330 provides that "[a]ny drug or device is misbranded if its labeling is false or misleading in any particular," and Cal. Health & Safety Code § 111440 makes it unlawful to manufacture, sell, deliver, hold, or offer for sale any drug that is misbranded. The Sherman Law incorporates the labeling requirements of the FDCA and its implementing regulations as the law of California.

92. As described in detail above, by labeling the Products in a manner that is false and misleading—representing that they are "non habit-forming" when they pose a risk of habitual use—Defendant violates 21 U.S.C. § 352(a) and Cal. Health & Safety Code § 111330, and thereby violates the "unlawful" prong of the UCL. Defendant's conduct also independently violates the CLRA and the FAL, as set forth below, each of which serves as a predicate for the "unlawful" prong.

93. Defendant's conduct that violates the Sherman Law is identical to conduct that violates the FDCA, 21 U.S.C. § 352(a). This identical conduct serves as the sole factual basis for each cause of action brought in this Complaint, and Plaintiff does not seek to enforce any state-law claim in a manner that would impose any standard of conduct different from, or in addition to, that required by the FDCA.

94. Through its unlawful acts and practices, Defendant has obtained, and continues to obtain, money from members of the Class. Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and the Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from

continuing to violate the UCL. Absent such relief, the Class may be irreparably harmed and denied an effective and complete remedy.

**THIRD CAUSE OF ACTION**
**"Unfair" Business Practices in Violation of the Unfair Competition Law (Bus. & Prof. Code §§ 17200, et seq.)**

95. Plaintiff incorporates each and every allegation contained in the paragraphs above as if fully restated herein.

96. A business act or practice is "unfair" under the UCL when any injury it causes to consumers outweighs any benefits provided to consumers and the injury is one that consumers themselves could not reasonably avoid; when it offends an established public policy; or when it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

97. Defendant has violated, and continues to violate, the "unfair" prong of the UCL through its false and misleading labeling of the Products as "Non habit-forming." The gravity of the harm to members of the Class resulting from this conduct outweighs any conceivable reasons, justifications, or motives of Defendant. Defendant's conduct confers no benefit on consumers; rather, it causes consumers to overpay for Products that do not conform to their reasonable expectations, and consumers cannot reasonably avoid this injury because the falsity of the Challenged Representation is not discernible at the point of sale.

98. Reasonably available, lawful alternatives existed to further Defendant's legitimate business interests. Defendant could simply have refrained from labeling the Products with the representation that they are "non-habit forming."

99. Through its unfair acts and practices, Defendant has obtained, and continues to obtain, money from members of the Class. Plaintiff has been injured and requests that this Court order Defendant to restore this money to Plaintiff and the Class, to disgorge its profits, and to enjoin Defendant from continuing to violate the

UCL. Absent such relief, the Class may be irreparably harmed and denied an effective and complete remedy.

**FOURTH CAUSE OF ACTION**
**"Fraudulent" Business Practices in Violation of the Unfair Competition Law (Bus. & Prof. Code §§ 17200, et seq.)**

100. Plaintiff incorporates each and every allegation contained in the paragraphs above as if fully restated herein.

101. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

102. Defendant's act and practice of labeling and advertising the Products as "Non habit-forming," when in fact the Products pose a risk of habitual use, is likely to deceive—and has deceived—reasonable consumers, including Plaintiff. The claim that the Products are "non-habit forming" is material because a reasonable consumer would consider it important in deciding whether to purchase the Products, and Plaintiff and the Class reasonably and detrimentally relied on it.

103. The specific circumstances of the fraudulent conduct are alleged above: Defendant (who), through the "non habit-forming" representation (what) prominently displayed on the principal display panel of the Products' front labels (where), throughout the Class Period (when), deceived reasonable consumers by representing that the Products do not and cannot cause habitual use when their active ingredient, diphenhydramine, poses a risk of habitual use (how).

104. Through its fraudulent acts and practices, Defendant has obtained, and continues to obtain, money from members of the Class. Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and the Class, to disgorge its profits, and to enjoin Defendant from continuing to violate the UCL. Absent such relief, the Class may be irreparably harmed and denied an effective and complete remedy.

**<u>FIFTH CAUSE OF ACTION</u>**
**False Advertising in Violation of**
**California Business & Professions Code §§ 17500, et seq.**

105. Plaintiff incorporates each and every allegation contained in the paragraphs above as if fully restated herein.

106. Defendant uses advertising and packaging to sell its Products. Defendant disseminated advertising concerning its Products—specifically, the, "non habit-forming" representation that is, by its very nature, unfair, deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§ 17500, et seq., because that representation is likely to deceive, and has deceived, members of the putative Class and the general public.

107. The representation was material and was disseminated to the public through the Products' labeling, packaging, and advertising with the intent to induce reasonable consumers, including Plaintiff and the Class, to purchase the Products.

108. In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of California Business & Professions Code §§ 17500, et seq.

109. As a direct and proximate result of Defendant's violation of the FAL, Plaintiff and members of the Class were harmed in the amount of the price premium and/or purchase price they paid for the Products. Plaintiff, on behalf of himself and the Class, and as they lack an adequate remedy at law, seeks an order requiring Defendant to disclose the true nature of its misrepresentation, to disgorge its ill-gotten gains, to make full restitution of all monies wrongfully acquired, and enjoining Defendant from continuing to violate the FAL, together with interest and attorneys' fees pursuant to California Business & Professions Code § 17535 and other applicable law.

**<u>SIXTH CAUSE OF ACTION</u>**
**Violation of the Consumers Legal Remedies Act**
**(California Civil Code §§ 1750, et seq.)**

110. Plaintiff incorporates each and every allegation contained in the paragraphs above as if fully restated herein.

111. This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§ 1750, et seq. (the "CLRA").

112. Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code § 1761(d). Defendant is a "person" within the meaning of Civil Code § 1761(c). The purchases of the Products constitute "transactions" within the meaning of Civil Code § 1761(e), and the Products constitute "goods" within the meaning of Civil Code § 1761(a).

113. Defendant has violated, and continues to violate, the CLRA in at least the following respects:

a. Cal. Civ. Code § 1770(a)(5), by representing that the Products have characteristics, uses, or benefits that they do not have;

b. Cal. Civ. Code § 1770(a)(7), by representing that the Products are of a particular standard, quality, or grade when they are of another; and

c. Cal. Civ. Code § 1770(a)(9), by advertising the Products with the intent not to sell them as advertised.

114. Defendant knew, or should have known, that the labeling of its Products was false and misleading and violated consumer-protection laws, and that these representations would be relied upon by Plaintiff and the members of the Class.

115. The "non-habit forming" representation was made to Plaintiff and all members of the Class. Plaintiff relied on the accuracy of the representation, which formed a material basis for his decision to purchase the Products. Because

Defendant's misrepresentation was uniformly made on the Products' labels, reliance may be presumed or inferred for all members of the Class.

116. Defendant carried out the scheme set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiff and the Class, and as a result Plaintiff and the Class have suffered an ascertainable loss of money or property.

117. In conjunction with the filing of this Complaint, Plaintiff will serve on Defendant a CLRA notice and demand pursuant to Civil Code § 1782 notifying Defendant of the conduct described herein and demanding that Defendant correct and rectify such conduct. At this time, Plaintiff seeks injunctive and equitable relief pursuant to Civil Code § 1780(a)(2) and § 1782. If Defendant fails to provide appropriate corrective relief within thirty (30) days, Plaintiff will amend this Complaint to seek actual, punitive, and statutory damages under the CLRA.

**PRAYER FOR RELIEF**

118. WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, and for the Counts so applicable on behalf of the general public, requests judgment and relief as follows:

A. An order certifying that this action is properly maintainable as a class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Restitution in the amount that Plaintiff and members of the Class paid to purchase Defendant's Products, or restitutionary disgorgement of the profits Defendant obtained from those transactions, for the Causes of Action for which such relief is available;

C. Compensatory damages for the Causes of Action for which they are available;

D. Statutory penalties for the Causes of Action for which they are available;

E. A declaration and order enjoining Defendant from marketing and labeling its Products deceptively, in violation of the laws and regulations specified in this Complaint, and requiring Defendant to conduct a corrective advertising campaign;

F. An order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest;

G. An order requiring an accounting for, and the imposition of a constructive trust upon, all monies received by Defendant as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein; and

H. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

DATED: September 29, 2026

Respectfully submitted,

Michael D. Braun
**KUZYK LAW, LLP**
2121Avenue of the Stars, Ste. 800
Los Angeles, California 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311
mdb@kuzykclassactions.com

**DENLEA & CARTON LLP**
Jeffrey I. Carton (pro hac vice forthcoming)
jcarton@denleacarton.com
Catherine H. Friesen (pro hac vice forthcoming)
cfriesen@denleacarton.com
John P. Kane (pro hac vice forthcoming)
jkane@denleacarton.com
2 Westchester Park Drive, Suite 410
White Plains, New York 10604
Tel.: (914) 331-0100
Fax: (914) 331-0105

*Counsel for Plaintiff*